UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,                                        No. 17-cr-20203

v.                                                              Hon. Arthur J. Tarnow

TOMMIE IRELAND,

    Defendant.

_____/

## Government's Response to Defendant's Motion to Modify Sentence [R. 26]

On October 22, 2016, Defendant Tommie Ireland was arrested with 83 knotted bags of cocaine, and was subsequently charged by the state. Less than three weeks later, he was selling drugs again—this time to an undercover ATF agent. Barely a month after meeting the agent, Ireland sold her a gun, despite not knowing what she intended to do with it. And then, not even a month after pleading guilty to his state drug charge, he was selling drugs to the undercover agent again. He pleaded guilty to possession with the intent to distribute a controlled substance and being a felon in possession of a firearm, the government recommended a 120-month sentence—well below the bottom of his 188–235-month guideline

1

range. (R. 23: Government Sentencing Memo, PgID 66–67). The Court sentenced him below that, to just 60 months.

Ireland began serving his current sentence on November 30, 2017. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

*First*, since January 2020, the Bureau of Prisons has been preparing for Covid-19, implementing strict precautions to minimize the virus's spread in its facilities. Following two recent directives from the Attorney General, the Bureau of Prisons is also assessing its entire prison population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. This process necessarily requires the Bureau of Prisons to identify the best candidates for release, ensure that their homes are suitable for home confinement, and arrange a way to quarantine each of them for 14 days. As of June 18, 2020, these directives have already resulted in at least 4,316 inmates being placed on home confinement. *See* BOP Covid-19 Website.

*Second*, Ireland does not qualify for compassionate release. Because Ireland has not sought compassionate release from the Bureau of Prisons

based on Covid-19, as required under 18 U.S.C. § 3582(c)(1)(A), the Court does not have jurisdiction to address his Covid-19-based argument until he exhausts his administrative remedies. Nor, in any event, does Ireland satisfy the statutorily mandated criteria for compassionate release. Because § 3582(c)(1)(A) requires that release be "consistent with" the Sentencing Commission's policy statements, Ireland's failure to meet the criteria in USSG § 1B1.13 alone forecloses relief. Even when Covid-19 is taken into account, Ireland is young and has no medical conditions that would satisfy the requirements in § 1B1.13(1)(A) & cmt. n.1. Further, Ireland has tested positive for Covid-19, but there is no indication in his medical records that he is suffering significant symptoms, which means that the basis for granting him compassionate release—the risk of contracting Covid-19—is no longer a threat to Ireland. His offense also makes him a danger to the community, *see* USSG § 1B1.13(2), because he sold a gun during the course of his crime. And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release because Ireland repeatedly sold drugs, even after law enforcement intervention, and put the public in danger by selling a gun.

## I.    BACKGROUND

In late 2016, the ATF received information that Ireland was involved in narcotics and firearms distribution in in the Detroit area. After learning about Ireland, ATF agents conducted five controlled drug and firearms transactions with him, using an undercover special agent. The controlled buys all went in largely the same fashion, with the undercover agent contacting Ireland, meeting with him, and buying 5–10 grams of heroin or cocaine from him. (R. 23: Government Sentencing Memo, PgID 67–69). After one of the later drug transactions, Ireland and the agent discussed the agent buying a gun from Ireland. After the conversation, Ireland confirmed he could sell the agent the gun:



Ireland sold the gun to the agent for $600, and sold the agent cocaine base one more time. After that sale, Ireland followed up on the earlier gun sale, and told the agent that he could obtain firearms from his "cousin" that he could sell to her, including assault rifles. Then, he made a phone call to his "cousin" and spoke to that person about buying further firearms. He also told the agent that he had sold other guns in the past.

Based on the undercover sales, ATF obtained a search warrant for Ireland's residence. When they executed it, they found 10 grams of cocaine base, drug paraphernalia, and a round of .40 caliber ammunition. The government then indicted Ireland on four counts of distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1); one count of possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1); and one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). (R. 1: Indictment). It was not Ireland's first experience with the criminal justice system. His oldest conviction—a felony firearms violation—involved Ireland pointing a loaded shotgun at police officers, before fleeing from them. (PSR ¶ 32). His three subsequent drug convictions each involved distribution or intent to distribute drugs, spanning nearly a decade span between 2007 and 2016, when the instant conduct occurred. (PSR ¶¶ 33–35). He was on bond for a state offense at the time he sold the drugs and gun to the undercover agent in this case. Ireland also sustained six probation violations across his four convictions. (PSR ¶¶ 32–35).

Ireland pleaded guilty to all six counts without any Rule 11 plea agreement. Based on his career offender status, the probation

6

department calculated his guideline range as 188–235 months' incarceration. While emphasizing the seriousness of his crime, the government's position was that a within-guideline sentence was not necessary, especially given the sharp increase from Ireland's prior state sentences to his potential exposure on this offense. (R. 23: Government Sentencing Memo, PgID 72–76). The government recommended a 120-month sentence (*id.* at 77), and the Court sentenced Ireland to 60 months (R. 25: Judgment).

Ireland began serving his prison sentence on November 30, 2017, and is currently incarcerated at FCI Butner in North Carolina. He is 32 years old, and his projected release date is August 17, 2021. He has no underlying medical conditions, though he did test positive for Covid-19 on or about June 5, 2020. (Ex. 2, Ireland Health Records). Ireland has moved for compassionate release. The BOP has no record of Ireland making any attempt to seek compassionate release through the BOP's administrative processes. (Ex. 1, Email Regarding Exhaustion). Thus, the Court should deny his motion.

## II.   ARGUMENT

### A.   The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.

#### 1.   The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *See* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. The current plan, which is in effect until June 30, 2020, requires that inmates in every institution be secured in their assigned cells or quarters for at least 14 days to stop the spread of the disease. Only limited group gathering is allowed, and social distancing is maximized. Staff and inmates are issued face masks to wear in public areas. *See* BOP FAQs:

8

Correcting Myths and Misinformation. And the movement of inmates
and detainees between facilities is severely restricted, with exceptions
only for medical treatment and similar exigencies.

Every newly admitted inmate is screened for Covid-19 risk factors
and symptoms. Asymptomatic inmates with risk of exposure are placed
in quarantine for a minimum of 14 days or until cleared by medical staff.
Symptomatic inmates are provided with medical evaluation and
treatment and are isolated from other inmates until testing negative for
Covid-19 or being cleared by medical staff under the CDC's criteria. In
areas with sustained community transmission, all staff are screened for
symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit
or higher are barred from the facility on that basis alone. A staff member
with other symptoms can be placed on leave by a medical officer.

Other access to the facilities has likewise been restricted.
Contractors are only permitted access if performing essential services,
and any contractor who requires access is screened for symptoms and risk
factors. Social and legal visits have been suspended to limit the number
of people entering the facility and interacting with inmates. But to ensure
that relationships and communication are maintained throughout this

disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

### 2.    The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. New legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-

10

26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 4,316 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Attorney General's directives have explained, these home-confinement decisions have required evaluating several criteria:

1. Each inmate's age and vulnerability to Covid-19;

2. Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and

3. Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP).

These criteria not only make sense, but also fit the realities of the Covid-19 pandemic far better than any other solution does. The Bureau of Prisons cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. It must focus on the

inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2). The Bureau of Prisons' home-confinement initiative thus appropriately focuses on the inmates who will most benefit from release and whose release is least risky.

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is more than reasonable to evaluate whether a particular inmate would adhere to release conditions, social-distancing protocols, and stay-at-home orders during the pandemic. And if a prisoner would be unlikely to take any Covid-19 restrictions seriously, he would also be far more likely than the general public to contract and spread Covid-19 if released.

12

The Bureau of Prisons also must account for the current strain on society's first responders. Police departments in many cities have stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-19-based fraud schemes have proliferated. There are real risks to public safety, and those risks will only increase if communities are faced with a sudden influx of prisoners. That is just one reason, among many, why the Bureau of Prisons must focus on releasing inmates who are the most vulnerable to Covid-19 and whose release will least endanger the public.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health

care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at \*6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## B. The Court should deny Ireland's motion for compassionate release.

Ireland's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid

sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Quite the contrary: a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia*, 954 F.3d 594, 595–96 (3d Cir. 2020). Because this requirement is a statutory one and not judicially crafted, it is mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016); *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 751 (6th Cir. 2019).

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, § 3582(c)(1)(A), and

release must be "consistent with" the Sentencing Commission's policy statements. As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, the district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

16

### 1. The Court is barred from granting release because Ireland has not exhausted his administrative remedies.

The Court must dismiss Ireland's motion, because he has not satisfied the exhaustion requirement for compassionate release under 18 U.S.C. § 3582(c)(1)(A). Until recently, only the Bureau of Prisons could move for compassionate release. The First Step Act of 2018 amended the statute, permitting defendants to move for it too. First Step Act § 603(b), Pub. L. No. 115-319, 132 Stat. 5194, 5239 (Dec. 21, 2018).

But the provision permitting a defendant-initiated motion includes an exhaustion requirement. *Id.* A district court may not grant a defendant's motion for compassionate release unless the defendant files it "after" the earlier of (1) the defendant "fully exhaust[ing] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or (2) "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia*, 954 F.3d 594, 595 (3d Cir. 2020).

Statutory exhaustion requirements, like the one in § 3582(c)(1)(A), are mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016). As the

17

Sixth Circuit has explained, there is a "sharp divide" that "separates statutory from prudential exhaustion." *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 751 (6th Cir. 2019). Unlike judicially crafted requirements, statutory requirements may not be excused, even to account for "special circumstances." *Ross*, 136 S. Ct. at 1856–57.

The Sixth Circuit recently addressed this issue squarely, and held that the statutory exhaustion requirement in § 3582(c)(1)(A) is "mandatory" and the court "must enforce it." *United States v. Alam*, ___ F.3d ___, No. 20-1298, 2020 WL 2845694, at *1 (6th Cir. June 2, 2020). Explaining that the statute outlines a "mandatory claim-processing rule," the court was clear that there is no "possibility of judge-made exceptions." *Id.* at *3. *Alam* directly forecloses Harper's appeal.

The only other court of appeals to address this question has agreed. In *United States v. Raia*, 954 F.3d 594, 595–97 (3d Cir. 2020), the Third Circuit held that the Covid-19 pandemic does not permit inmates or district judges to bypass § 3582(c)(1)(A)'s exhaustion requirement. Rather, "[g]iven BOP's shared desire for a safe and healthy prison environment, . . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Id.* at 597.

18

The majority of district courts to decide this question nationwide, including many in our district, have similarly held that a "failure to exhaust" under § 3582(c)(1)(A) "cannot be excused, even in light of the Covid-19 pandemic." *United States v. Alam*, No. 15-20351, 2020 WL 1703881, at \*2–\*3 (E.D. Mich. Apr. 8, 2020); *accord United States v. Shah*, No. 16-20457, 2020 WL 1934930, at \*2 (E.D. Mich. Apr. 22, 2020); *United States v. Mathews*, No. 14-CR-20427-02, 2020 WL 1873360, at \*2– \*3 (E.D. Mich. Apr. 15, 2020). As one of those decisions has explained, the few courts that have excused exhaustion under § 3582(c)(1)(A) have mistakenly relied on cases addressing *judge-made* exhaustion requirements, not *statutory* exhaustion requirements. *Mathews*, 2020 WL 1873360, at \*2–\*3.

Congress's reasons for § 3582(c)(1)(A)'s exhaustion requirement apply with even greater force during the COVID-19 pandemic. The Bureau of Prisons is already responding to the pandemic—not just through heightened safety measures, but by evaluating its entire prison population for home confinement. By requiring a defendant to exhaust, § 3582(c)(1)(A) gives the Bureau of Prisons the opportunity to gather his medical documentation and other records, evaluate his request, and

decide in the first instance whether it justifies either compassionate release or some other form of relief. As the Third Circuit observed: "Given BOP's shared desire for a safe and healthy prison environment, . . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Raia*, 954 F.3d at 597.

Ireland did not exhaust his administrative remedies. Ireland has never requested a reduction in sentence from the BOP. (Ex. 1, Email Regarding Exhaustion). Ireland has therefore not satisfied § 3582(c)(1)(A)'s mandatory exhaustion requirement.

### 2. There are no extraordinary and compelling reasons to grant Ireland compassionate release.

Even if Ireland had exhausted his administrative remedies, compassionate release would be improper. Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describe[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of defendants who are most in need. That policy statement limits

21

"extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1. As the Tenth Circuit recently explained, a district court "lack[s] jurisdiction" to grant compassionate release when a defendant's circumstances do not fall within those categories. *Saldana*, 2020 WL 1486892, at *3.

Ireland does not argue that he should be released based on any of those categories, and none of them favor his release. He is 32, has no record of prior serious health conditions, and there is no indication that he has extraordinary family circumstances that would warrant his release. On or about June 5, 2020, tested positive for Covid-19. (Ex. 2, Ireland Health Records). The records do not reflect—and the government is not aware of—Ireland suffering any significant symptoms from Covid-19. If Ireland has already recovered, the reason for the BOP's expansion of the home confinement initiative would no longer apply to Ireland, and he should not be released. *See, e.g.*, *United States v. Bland*, No. 18-20555 (E.D. Mich. May 28, 2020) (order denying motion for compassionate

release where defendant had already contracted Covid-19 because "[t]he risk of contracting COVID-19 a second time and potentially developing a more severe response is not akin to the type of 'extraordinary and compelling reasons' justifying compassionate release") (Goldsmith, J.). Moreover, as Ireland's prior conduct shows, he would also be unlikely to follow basic restrictions on release—much less the CDC's social-distancing protocols or a stay-at-home order.

Nor does the Covid-19 pandemic by itself qualify as the type of inmate-specific reason permitting compassionate release. As the Third Circuit explained, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Ireland and other inmates. Nothing in the statute or USSG § 1B1.13 supports the unbounded interpretation of § 3582(c)(1)(A) that he now asks this Court to adopt. *See Raia*, 954 F.3d at 597.

Ireland is not eligible for compassionate release.

### 3.   The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate is statutorily eligible for a sentence modification based on "extraordinary and compelling reasons," compassionate release is not necessarily appropriate. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine whether those factors support release. So even if the Court were to find Ireland eligible for compassionate release, the § 3553(a) factors should still disqualify him.

Ireland's offenses were extremely serious and dangerous, as this Court previously recognized in denying Ireland's motion for bond (ECF Nos. 15–17). In the government's view, the firearm offense and the drug offenses were both extremely serious, for separate reasons. Regarding the firearm offense, Ireland demonstrated a callous disregard for the safety of the community by selling a gun to a person that he had only known for less than a month, in the context of several drug transactions. Had Ireland sold a gun to a friend or associate, the government's view as to the seriousness of this count would be very different. Instead, Ireland had no idea what the buyer was planning to do with the gun, and indeed, this

24

particular gun had been used in multiple shootings in the past. In a city that consistently ranks among the highest levels of gun violence in the country, the dangerousness of such conduct cannot be overstated.

Further, the gun that Ireland sold to the undercover agent was more than just a standard pistol. It had the capacity to accept an extended-length magazine, and Ireland sold just such an extended-capacity magazine in that same transaction. The U.S. Sentencing Commission has recognized the increased danger associated with such weapons in promulgating an enhanced base offense level for weapons capable of accepting large capacity magazines. See U.S.S.G. § 2K2.1(a); PSR ¶ 26. The fact that Ireland was willing to sell such a dangerous weapon to a stranger demonstrates the dangerousness and severity of this crime. And Ireland was apparently ready and willing to do more—he told the agent after the final drug sale that he could sell her an assault rifle, that he had sold other guns in the past, and even took steps to facilitate further gun sales to the agent. Ireland's actions demonstrate that he was willing to put his own profit above the safety of his fellow citizens.

Ireland's drug sales demonstrate a different aspect of his culpability. While any controlled substance offense is serious and dangerous, Ireland was on bond for his December 20, 2016 drug conviction at the time of five of the six controlled transactions charged here. He has demonstrated that, despite being given numerous second chances following his prior sentences, he would not be stopped from continuing to sell drugs and guns.

**C.     If the Court were to grant Ireland's motion, it should order a 14-day quarantine before release.**

If the Court were inclined to grant Ireland's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

## III.  CONCLUSION

Ireland's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney


*s/John B. Meixner Jr.*
John B. Meixner Jr.
Assistant United States Attorney
211 W. Fort St., Suite 2001
Detroit, MI  48226
(313) 226-9626
john.meixner@usdoj.gov

Dated: June 18, 2020

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 18, 2020, I electronically filed the foregoing document with the Clerk of the Court of the Eastern District of Michigan using the ECF system, which will send notification of such filing to all counsel of record via electronic mail.

I further certify that on June 18, 2020, I filed Exhibit 2 of the Government's Response, *under seal*, with the Clerk of the Court.

*s/John B. Meixner Jr.*
John B. Meixner Jr.
Assistant United States Attorney
211 W. Fort St., Suite 2001
Detroit, MI 48226
(313) 226-9626
john.meixner@usdoj.gov

28

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                                Case No. 18-20555
                                                            Hon. Mark A. Goldsmith

vs.

NATHANIEL BLAND,

        Defendant.

_____/

## OPINION & ORDER
## DENYING DEFENDANT NATHANIEL BLAND'S MOTION FOR COMPASSIONATE
## RELEASE (Dkt. 39)

        The Court received a letter by Defendant Nathaniel Bland on May 5, 2020, which the Court

construed as a motion for compassionate release due to the impact of the Coronavirus pandemic

(Dkt. 39). Bland was sentenced on December 5, 2019, to 39 months' imprisonment after pleading

guilty to being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). See

Judgment (Dkt. 38). In the present motion, Bland seeks compassionate release and requests that

the Court reduce the remaining months of his prison sentence to home confinement because of the

dangers posed by COVID-19. For the reasons that follow, the Court denies Bland's motion.

## I.      BACKGROUND

        Bland is currently serving his sentence at the Federal Correctional Institution ("FCI") in

Milan, Michigan. FCI Milan has had seventy-two confirmed cases of COVID-19 among its

inmates, but only five are still pending recovery.[1] The Bureau of Prisons ("BOP") has been given

increased authority to place federal prisoners in home confinement based on the threat posed by

_____

[1] https://www.bop.gov/coronavirus/ (last visited on May 26, 2020).

COVID-19, and it is conducting a case-by-case analysis of its inmates to evaluate the feasibility of home confinement. Resp. at 2-3, 11.

Bland is thirty-nine years old, and has Type II diabetes and hypertension. Bland Medical Records, Ex. 1 to Gov't Resp., at PageID.235. (Dkt. 43-1). On March 26, 2020, Bland requested compassionate release from the BOP, which was denied. He then filed the present motion seeking a reduction in sentence from this Court under the First Step Act. A week later, Bland tested positive for COVID-19. Id. at PageID.218. Bland experienced mild symptoms, recovered, and was released back to his unit on May 6, 2020. Id. at PageID.191-208.

## II.    LEGAL STANDARD

"The First Step Act of 2019, Pub. L. 115-391, 132 Stat. 5194, modified the statute concerning the compassionate release of federal prisoners, 18 U.S.C. § 3582," such that district courts may entertain motions filed by incarcerated defendants seeking to reduce their sentences. United States v. Sapp, No. 14-cr-20520, 2020 WL 515935, at *1 (E.D. Mich. Jan. 31, 2020). Under 18 U.S.C. § 3582(c)(1)(A)(i), a court may reduce a sentence if, after considering the sentencing factors set forth in § 3553(a), the court finds that "extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

In the commentary to U.S.S.G. § 1B1.13, the Sentencing Commission has enumerated several extraordinary and compelling reasons justifying a reduction of sentence, including the "Medical Condition of the Defendant," "Age of the Defendant," and "Family Circumstances." U.S.S.G. 1B1.13 cmt. n.1(A)-(C). Some examples of compelling reasons are medical conditions "with an end of life trajectory," a defendant's serious physical deterioration related to the aging process, and death or incapacitation of a caregiver of a defendant's minor child or children. Id.

The Guidelines also contemplate "Other Reasons" where the defendant has "extraordinary and compelling reasons other than, or in combination with" the other enumerated reasons. U.S.S.G. 1B1.13 cmt. n.1(D).

### III.    ANALYSIS

Bland has an elevated risk of developing the more severe symptoms of COVID-19 due to his Type II diabetes and hypertension.[2]  However, that risk did not manifest when Bland contracted COVID-19 and experienced milder COVID-19 symptoms.  Fortunately, after treatment at FCI Milan, Bland recovered and was released back to his unit.  It is not yet clear whether an individual can contract COVID-19 a second time, but according to the Center for Disease Control, re-infection of similar type viruses is unlikely.[3]

The risk of contracting COVID-19 a second time and potentially developing a more severe response is not akin to the type of "extraordinary and compelling reasons" justifying compassionate release identified by the Sentencing Commission.  Additionally, Bland's risk of a second infection is further mitigated by the measures FCI Milan has taken to reduce inmate infections.  FCI Milan has had seventy-two confirmed cases of COVID-19 among its inmates.  The number of cases now pending at the facility is five.

In light of Bland's recovery and access to medical services at FCI Milan, the risk that Bland may contract COVID-19 a second time does not fall in the category of illnesses with an end of life

---

[2]    See    https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited on May 26, 2020).

[3] See https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html (explaining viral immunity) (last visited on May 26, 2020).

trajectory, or other reasons, under the guidelines. A reduction in sentence would not be consistent with the policy statements issued by the Sentencing Commission.[4]

Therefore, Bland is not entitled to compassionate release.

## IV. CONCLUSION

For the reasons stated above, Bland's motion for compassionate release (Dkt. 39) is denied.

SO ORDERED.

Dated: May 28, 2020          s/Mark A. Goldsmith
    Detroit, Michigan          MARK A. GOLDSMITH
                             United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 28, 2020.

                             s/Karri Sandusky
                             Case Manager

---

[4] Even in the context of pretrial release—which is not confined by the stringencies of the "extraordinary and compelling reasons" standard applicable here—courts have not granted relief from custody without a strong showing that a prisoner has a significant risk of suffering harm from COVID-19. <u>See, e.g.</u>, <u>United States v. Wise</u>, No. 18-20799, 2020 WL 1873364, at *3 (E.D. Mich. Apr. 15, 2020); <u>United States v. Brown</u>, No. 13-20337, 2020 WL 2092651, at *5-7 (E.D. Mich. May 1, 2020).